# Illinois Official Reports

## Supreme Court

---

**People v. Pearse, 2017 IL 121072**

---

| | |
|---|---|
| Caption in Supreme Court: | THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. BRIAN PEARSE, Appellant. |
| Docket No. | 121072 |
| Filed | March 23, 2017 |
| Decision Under Review | Appeal from the Appellate Court for the Second District; heard in that court on appeal from the Circuit Court of Boone County, the Hon. Robert Tobin, Judge, presiding. |
| Judgment | Reversed. |
| Counsel on Appeal | Michael J. Pelletier, State Appellate Defender, Thomas A. Lilien, Deputy Defender, and Jack Hildebrand, Assistant Appellate Defender, of the Office of the State Appellate Defender, of Elgin, for appellant. |
| | Lisa Madigan, Attorney General, of Springfield (David L. Franklin, Solicitor General, and Michael M. Glick and Evan B. Elsner, Assistant Attorneys General, of Chicago, of counsel), for the People. |

CHIEF JUSTICE KARMEIER delivered the judgment of the court, with opinion.

Justices Freeman, Thomas, Kilbride, Garman, Burke, and Theis concurred in the judgment and opinion.


**OPINION**

¶ 1 Following a jury trial in the circuit court of Boone County, defendant, Brian Pearse, was convicted of failing to register his address in accordance with section 3 of the Sex Offender Registration Act (Act) (730 ILCS 150/3 (West 2012)). On appeal, defendant argued that (1) he was not proved guilty of that offense beyond a reasonable doubt and (2) the trial court erred in giving the jury nonpattern instructions that did not apply to the facts of the case. The appellate court, with one justice dissenting, affirmed the defendant's conviction. 2016 IL App (2d) 140051-U. We allowed the defendant's petition for leave to appeal (Ill. S. Ct. R. 315(a) (eff. Jan. 1, 2015)) and now reverse the judgment of the appellate court.

¶ 2 STATUTES INVOLVED

¶ 3 Section 2(I) of the Act defines a "fixed residence" as "any and all places that a sex offender resides for an aggregate period of time of 5 or more days in a calendar year." 730 ILCS 150/2(I) (West 2012).

¶ 4 Section 3 provides in pertinent part:

"(a) A sex offender *** shall, within the time period prescribed in subsections (b) and (c), register in person and provide accurate information as required by the Department of State Police. *** The sex offender *** shall register:

(1) with the chief of police in the municipality in which he or she resides or is temporarily domiciled for a period of time of 3 or more days ***[.]

* * *

For purposes of this Article, the place of residence or temporary domicile is defined as any and all places where the sex offender resides for an aggregate period of time of 3 or more days during any calendar year. ***

A sex offender or sexual predator who is temporarily absent from his or her current address of registration for 3 or more days shall notify the law enforcement agency having jurisdiction of his or her current registration, including the itinerary for travel, in the manner provided in Section 6 of this Act for notification to the law enforcement agency having jurisdiction of change of address.

* * *

(b) Any sex offender ***, regardless of any initial, prior, or other registration, shall, within 3 days of *** establishing a residence, place of employment, or temporary domicile in any county, register in person as set forth in subsection (a) ***." 730 ILCS 150/3(a), (b) (West 2012).

¶ 5 Section 6 of the Act states in relevant part:

"If any other person required to register under this Article changes his or her residence address *** he or she shall report in person, to the law enforcement agency with whom he or she last registered, his or her new address ***." 730 ILCS 150/6 (West 2012).

¶ 6                                                    BACKGROUND

¶ 7         Pretrial proceedings in this case are fully discussed in the appellate court's disposition, and we need not reiterate that account here. We note only that there was considerable uncertainty among the parties and the circuit court as to what, precisely, defendant was charged with and what the State had to prove, and intended to prove, in order to secure a conviction under section 3 of the Act, the statutory provision identified in the indictment. In the course of hearings addressing defendant's demand for a bill of particulars, the prosecutor stated his theory to be that defendant "never registered a change of address" after he returned to his home in Belvidere following a short stay in the hospital. The quoted language tracked that used in the indictment, wherein, as amended, the State alleged that defendant "failed to register a change of address in accordance with the provisions of the Child Sex Offender Registration Act, with the Chief of Police, or his designee, of the City of Belvidere, Boone County, Illinois, within three days of moving from his registered address." The trial court observed, since defendant had previously registered his home address in Belvidere, the State's theory suggested that defendant would be required to "reregister that place" upon his return.

¶ 8         At defendant's jury trial, the State's first witness, Forest Park police Officer Jason Keeling testified that, on January 5, 2012, he was directed by his dispatcher to River Edge Hospital in Forest Park to register a sex offender.[1] Keeling filled out a registration form for defendant. The form, admitted into evidence as People's Exhibit No. 1, contained several headings with associated boxes that could be checked. Keeling checked the box for "Initial Registration." He did *not* check the box for "Change of Address." Keeling listed the address of the hospital as defendant's "resident address" and, pursuant to information provided by defendant, listed defendant's previously registered, home address—1123 South State Street, Belvidere—as defendant's "secondary address." After Keeling filled out the form, he presented it to defendant for his review and signature. Keeling subsequently turned the form over to his dispatcher for processing.

¶ 9         Julie Grubar, a Belvidere police officer, testified that, on October 18, 2011, well before defendant entered the hospital, she had visited 1123 South State Street, a two-story house in Belvidere, to make sure defendant was residing there. That day, she filled out a form verifying that defendant lived at 1123 South State Street. The form was delivered to the dispatch department, and a Law Enforcement Agency Data System (LEADS) report was

---

[1] In his opening statement, defense counsel suggested that defendant "ask[ed] for assistance from the hospital in making arrangements to register his address at Forest Park to let the officers know in Forest Park that he is temporarily there," but we find no testimony in the record to that effect. Such a request would, however, provide one explanation for how authorities became aware of defendant's presence at the hospital. Another might be the implication, in the limited testimony of a defense witness, that defendant was involuntarily committed while at a Belvidere hospital before he was transferred to the hospital in Forest Park.

created and entered into the database. The form was, ultimately, admitted into evidence as defendant's Exhibit No. 1.

¶ 10    On January 27, 2012, Grubar was dispatched to the 200 block of East Fifth Street in reference to a "suspicious person." She then went to 1123 South State Street. Over objection, Grubar was allowed to testify that she went to that location because the "suspicious person" resided at that address. Grubar said she was looking for defendant, and she, at that point in her testimony, identified him in open court.[2] Grubar testified that she got no response on that occasion, but she went back to the South State Street address on February 2, 2012. She again did not get a response but then noticed there was an upstairs apartment designated 1123½. She went upstairs and knocked, and defendant came to the door. Grubar conversed with defendant, asking him, first, if he had been in a hospital in Forest Park, to which he responded affirmatively. She then asked him how long he had been out of the hospital. He responded "about two weeks." Defendant confirmed that he had been at 1123½ South State Street since his release from the hospital. Grubar subsequently sent a report to Sergeant Mark Pollock, who was in charge of registering sex offenders. On February 6, 2012, Grubar returned to defendant's residence and arrested him for failing to register as a sex offender at that address.

¶ 11    Sergeant Mark Pollock of the Belvidere police department testified that he is in charge of supervising the registration of sex offenders in the city of Belvidere. As Pollock began to testify regarding the forms used for registration, defense counsel interposed an objection, and at sidebar, the parties argued over the legal significance of the terminology of the forms. The court ruled: "I think he can identify the forms. He's been trained on those forms. The forms aren't the law, the forms are created by the state police, I would assume, for purposes of executing their duties. So he can identify what those boxes are for ***." The court concluded: "Again we're not getting into what the law is, just what the box means."

¶ 12    Pollock testified that sex offender registration forms are provided by the Illinois State Police (ISP) and forms, once completed, are maintained in the Belvidere police department and copies are faxed to the Illinois State Police Sex Offender Registration Unit for entry of limited information into its database. Pollock noted that there are two places for address designation in the body of the form: one for a "resident address" and another for a "secondary address." According to Pollock, the "resident address" is considered the primary address of the person registering, and that is the address entered in the ISP database. Pollock stated that the "resident address" on the form is considered the registrant's "current address" for purposes of the database. A search of the ISP database would disclose only that address. Pollock never fully explained the import of the "secondary address," nor is an explanation set forth in the form itself. Under cross-examination, however, Pollock *did* suggest that a registering officer might fill out a form in a manner that would give the secondary address significance:

> "MS. POIRIER [Defense Counsel]: So you are saying that you do not report to the Illinois State Police the secondary address; correct?

---

[2]Defendant apparently did not raise Grubar's reference to him as "a suspicious person" as an issue in the appellate court, nor does he raise it here.

POLLOCK: No, that is not what I'm saying. What I'm saying is that the primary address listed on the form is the address that will show up as the primary address when you run them. If there is extenuating stuff on there, there is like a memo or notes part at the bottom of the [LEADS] agency data system, that you can go to to check to see if there is initial stuff on there, if that was put in there—if there was something put in there."

Pollock provided no further elaboration, subsequently reiterating that a LEADS inquiry would turn up only the address designated as the "resident address," not the "secondary address."

¶ 13    With respect to this case, specifically, Pollock testified, when Grubar contacted him on February 2, 2012, he checked the ISP database and determined that defendant's current registered address was not in Belvidere. Pollock also stated that he checked the defendant's personal file in the Belvidere police department and determined defendant "had not registered with the Belvidere Police Department his current address in Belvidere." Under cross-examination, Pollock acknowledged defendant's Exhibit No. 2, which he *assumed* had come from his own records. He conceded that defendant's registered address on that form—dated April 6, 2011—was 1123 South State Street in Belvidere.

¶ 14    In his testimony, Pollock further spoke to the internal limitations in the registration system set up by the ISP, as utilized by the various law enforcement agencies. Referring to People's Exhibit No. 1—the form filled out by Officer Keeling on defendant's behalf—Pollack noted:

"[T]he actual physical form that he signed and fills out, we don't see that from Forest Park because they don't know where to send it to. We would only see what is entered by the Illinois State Police, if we pull up their website information."

¶ 15    In other words, as it pertained to this case, Pollock testified that Forest Park officers registering the defendant with a hospital address in their jurisdiction were not required to send notice to the law enforcement agency associated with another, secondary address identified on the form—in fact, they would not even have *known* "where to send it"—though inquiry would have disclosed, prior to Forest Park's own submission to the ISP, that defendant's then "current address" was the same address designated as secondary on Forest Park's form. Despite defendant's reporting both addresses on a single form, law enforcement procedures provided for no direct communication between the Forest Park and Belvidere police departments.

¶ 16    After Pollock's testimony and a stipulation that defendant was a sex offender as defined by Illinois law—identified and admitted as People's Exhibit No. 2—the State rested, and defendant moved for a directed verdict. Defense counsel argued:

"[T]he State has presented no evidence that my client changed his address, [he] only registered a temporary address.

Under the law the definition of a fixed place of residence is any and all places that he stayed for an aggregate of five or more days in a calendar year. He registered the Belvidere address[,] and he registered in Forest Park his address. Those are both addresses in the aggregate. There was no change. He never stopped living in Belvidere. When he registered in Forest Park[,] he registered the address here in Belvidere. The fact it got put in the computer in Forest Park had nothing to do with

what Mr. Pearse did. You cannot blame him for what the State did, you can not blame him for what Sgt. Pollock was relying upon the [*sic*] information.

The information that Brian Pearse reported is all that matters[,] and what he reported is that he was living in both places. He did what was required under the law[,] and we ask that you direct a verdict of not guilty."

The court denied the motion, stating:

"I believe that while one can have multiple residences, whether they're deemed permanent, fixed, or temporary, you have to at least identify and fill out a change of residence form—a change of address form when you go from one to the other. So while one can conceivably have ten such places in a given 12 month period, you at least have to let the state police know so they can put it on the website as to which of those places you are going to be within three days of going from one to the other."

¶ 17 With that ruling, the defendant presented his first witness, his father, Arnold Pearse. Mr. Pearse testified that he had lived at 1123 South State Street in Belvidere for approximately 35 years and, in April 2011, the defendant lived with him, staying in an upstairs apartment in the same house. Mr. Pearse testified that defendant lived at that address all of that year until he was admitted to Highland Hospital in Belvedere sometime in January 2012. He was subsequently transferred to another medical facility. Defendant was in the hospital less than a week. He paid rent every month, including February 2012.

¶ 18 For his last witness, defendant called Belvidere police Officer Shane Polnow in an attempt to establish the circumstances of defendant's admission to Highland Hospital—apparently voluntary admission after a "suicide threat" with status subsequently changed to involuntary admission—and defendant's subsequent transfer out of that facility. As defense counsel began her questioning, Polnow testified that he was on patrol January 1, 2012, when he was dispatched to "a possible suicide threat." The prosecutor objected, arguing that the testimony was irrelevant, nothing more than an attempt to invoke sympathy for defendant. Defense counsel explained that she was not attempting to establish anything with respect to defendant's mental state at the time, only aspects of Polnow's investigation, including verification of defendant's residence at the time and the fact that Polnow "made a report in [LEADS]." The prosecutor contended that would be hearsay, and the court agreed that "[t]he report in [LEADS] is probably hearsay." The objection was ultimately sustained.

¶ 19 Defense counsel then asked: "Did you as part of your investigation of this incident make any arrangements on Brian Pearse's behalf?" Polnow responded, without objection: "Later I was called back. Well, he voluntarily went into the hospital. I was later called back by the nursing staff to fill out a form five to insure that he stayed in the hospital." When defense counsel asked Polnow to explain the nature of that form, the prosecutor objected that the defense was "now getting into the mental state of the defendant." When asked for an explanation of relevancy, defense counsel answered, "the fact that [defendant] was removed from Belvidere against his will, whether he changed his address or not, that was not his choice." The court sustained the State's objection—the court having previously noted that registration violations under the Act are strict liability offenses—but allowed counsel to inquire whether Polnow had any information as to whether or not defendant was transferred from the hospital and the date that occurred. Subsequent questioning revealed that Polnow

had no such knowledge, and that concluded the questioning of Polnow and the presentation of defendant's case.

¶ 20    During the instruction conference, the pretrial confusion over statutory elements, applicable sections, and required proof surfaced once again. In particular, the court struggled with whether section 3—the section actually identified in the indictment—or section 6 of the statute applied. We quote, *at length*, portions of the parties' extended colloquies in order to fully illustrate the extent of the confusion engendered by the statutory scheme when applied to these facts:[3]

> "MS. POIRIER: [H]e's charged with a change, Your Honor, not failing to register.
>
> MR. WATSON [The Prosecutor]: Yes but my point is current address is mentioned separately [in section 3(a)]. It's not phrased as temporary domicile or place of residence.
>
> THE COURT: All right, so [(a)] references subsection [(b)], which indicates that the sex offender regardless of any initial prior or other registration shall within three days of establishing a residence—register in person as set forth in [(a)]. So the State is coming under 150/3, really [(b)], with the reference—and [(b)] reference back to [(a)]—let me see the bill—whereas 6—
>
> MS. POIRIER: So why did the bill of indictment say change of address and why did I go through all of that hassle of my—
>
> THE COURT: Right.
>
> MS. POIRIER: —demand for bill of particulars if it's not referenced to subsection 6 of a change of address?
>
> THE COURT: I guess the proof—if after reading the bill and listening to the proofs, it sounds like the State is real [*sic*] proceeding under 150/6, failure to register a change of his residence address as opposed to establishing a residence. Three indicates that he would have to within three days of establishing a residence.
>
> MS. POIRIER: If that is the way they want to go, then I'd renew my motion for a directed verdict.
>
> * * *
>
> THE COURT: Six—at least the way I'm reading this in real world terms the difference I would guess is that under three, to use my puddle jumping analogy, every lily pad that you establish on the pond, every time you establish a new one might fall under three, subsection three because it uses the word establish a residence; whereas if you already have lily pads out there that you are just bouncing back and forth amongst, you have an obligation to notify them of a change of address, which would be 6 but it doesn't use the term establish residence.
>
> * * *

---

[3]We believe the words of the parties and the trial court make these points more poignantly than our mere summation of the discussion ever could. It seems to us an exceedingly rare instance that the parties and the court, after the proofs have been concluded, are still arguing, cumulatively, over what statutory section applied, the parameters of the charge, what had to be proven, and what *had* been proven.

THE COURT: I think the statute has the wrong subsection.

MR. WATSON: That is fine.

THE COURT: The proofs would comply with that.

\* \* \*

MS. POIRIER: Hence we should go back to my motion to dismiss.[4]

THE COURT: If we went with—if the State was arguing that it wasn't change of address but instead arguing that he established a residence, a new residence, pursuant to subsection [3(b)], I think your directed verdict would have been granted at least that protects your record. \*\*\* I believe based upon the wording of the bill of indictment, as well as the proofs, it indicates that the State is really going under subsection 6, change of address, in other words he jumped on a different lily pad but one that was already there.

\* \* \*

MR. WATSON: \*\*\* What we're saying, Judge, I think is that the defendant had a duty to provide information under subsection 3 and then under 6, that is what he failed to do within three days \*\*\*.

\* \* \*

THE COURT: I'm trying to read No. 6. No. 6, if we read it, unless [I'm] reading the wrong provision of that, it says if any other person required to register under this article should changes [*sic*] his or her residence address, he shall report in person to the law enforcement agency with whom he last registered his new address, change of employment, *et cetera*, *et cetera*, which under the strict reading of that would lead me to believe under 150/6 he should have went back to Forest Park under 6, which then would mean that 3—and again it's been awhile since I read the statute, I should have read it before hand—which means it really did come under 3 because 3 is registering with the place you are going to be living as opposed to the place \*\*\* you were living.

\* \* \*

MS. POIRIER: I think this goes back to my point that this law is written in such a way that nobody can read it and understand it.

\* \* \*

THE COURT: I would think [(b)] would come into play under 150/3 because again this would be the place that he registers where he's going to be living, which threw me off a little bit is that word establishing. I agree with Ms. Poirier it's a horribly written statute.

MR. WATSON: Judge, I guess under [(b)], [3(b)], it talks about regardless of any prior initial or prior registration. So even though he registered in April of 2011 when he moved back to Belvidere, he was then reestablishing his residence here and he had three days to notify the Belvidere Police Department under [(b)].

\* \* \*

---

[4]In his motion to dismiss, defendant had argued that the bill of indictment was deficient on its face for failure to state an offense.

I would say when he registered his primary address in Forest Park that would then be his primary residence and he's coming back and basically reestablishing he's living at 1123 and-a-half, Belvidere. He's reestablishing that as his address.

THE COURT: So if he had registered Forest Park as a temporary domicile,[5] again just I'm thinking out loud—you are certainly free to critique on this—if he registered in Forest Park as a temporary domicile, he wouldn't reregister here because he wouldn't be reestablishing a residence, he instead just said Forest Park is a temporary domicile however because it was registered—

MR. WATSON: Because he didn't know how long he was going to stay at the hospital.

THE COURT: He didn't know how long he was going to stay.

MR. WATSON: And that is why they gave him the year and date[6] because they didn't know if he'd been in the hospital for a year. And when he left and came back, then he's reestablishing his residence here in Belvidere and he has three days after doing that to go to the Belvidere Police Department and say I'm back in town."

¶ 21    Defense counsel then pointed out that section 3 defines a "fixed residence" as "any and all places" that a sex offender resides for the statutorily required aggregate period of time and cited *People v. Robinson*, 2013 IL App (2d) 120087, for the proposition that an offender may have more than one fixed residence at a time, arguing that was the case here. She observed that defendant had registered all "fixed residences," *i.e.*, those places he had arguably "resided at" for the statutorily specified number of days.

¶ 22    The prosecutor, however, insisted that defendant's return to his residence, after the short hospital stay, qualified as "establishing a residence" for purposes of section 3(b): "[W]hen defendant moved back into Belvidere, he has three days to notify the Belvidere Police Department and that is regardless of any prior registration under [(b)]. So the prior ones don't count. So when he comes back to Belvidere, he is in essence then after three days has a residence here. It's the same residence he had before he went to the hospital but it is a residence and that is what he's required to come in and notify." The trial court, warming to that interpretation, responded: "So it's fair to say then you really are—the word establishing under subsection [(b)] would also include reestablishing." The prosecutor continued: "So in essence, his prior registration in 2011 doesn't count, it doesn't exist in other words under subsection [(b)]. So when he moves back into Belvidere, even though that is his address before he went to the hospital, he has—once he's lived there for three days—it then becomes his residence address and he has to register that with the Belvidere Police Department."

¶ 23    Defense counsel continued to argue: "Your Honor, my client did not establish a new address. This was the one that he stayed at. That is what he reported at Forest Park. It is not someone who said I'm making a change of address. The evidence was that he added the temporary address. There was not a change." The court then challenged defense counsel to give the statutory phrase "regardless of any initial, prior, or other registration" meaning. In

---

[5]The registration form provided by the State Police—admitted as an exhibit at trial—does not provide a "temporary domicile" option, nor does that term appear anywhere on the document.

[6]This is apparently a reference to the annual reporting requirement set forth in section 6 of the Act. See 730 ILCS 150/6 (West 2012).

what appeared, at the time, to be defense counsel's final argument before the court's ruling, counsel responded:

> "As the *People v. Robinson* case says, a person is required to register every place that he's staying at. *** It's not that you come in and say I'm here today and then I'm there tomorrow. You have to register both places and both places give you intent to stay at during this calendar year. Once you've been there three days, once you've been there five days you have to register this place as a residence. And it's saying that regardless of the fact that you are registered here in Belvidere, if you establish a residence in Forest Park, you must then register that one as well. It does not then cancel out what he did here in Belvidere.
>
> It is adding it and saying that regardless of what has gone on before, you are required to register in the county that you are. And because the point is for the police to know where you are so this whole system of you only put one address in the computer actually is backfiring because this person has put in both addresses. The police need to know that both address [*sic*] are a place that he could be found because these are places that he's staying at.
>
> He has stayed there for five days this year. He needs to keep that, it's a place he could go back to. Let's say that this is grandma's house. If he goes to grandma's house he needs to register that place once he's been there five days. That becomes his secondary or first address. The statutes doesn't [*sic*] even define primary versus secondary, it says fixed place of residence, any or all addresses, so it's saying if you register here in Belvidere at one address and then you establish one in Rockford, you have to add that one to your registry. You have to register that one in Rockford according to the laws there so they will know that you could be found there."

¶ 24    With that, the court announced "[h]ere is my ruling," prefacing it at the outset with the anticipatory observation that "the Second District is going to need to probably clarify this one way or the other." Continuing, the court conceded, "the statute is inconsistent, but I think it identifies that one might actually have to register more than one location." The court, however, expressed concern that a person might "game the system," that "one can establish conceivably in any 12 month period 30 places and bounce back and forth amongst those 30 places never staying at one longer than another in which case nobody would ever really know where you live." The court expressed the valid concern that "folks in [the] neighborhood have a right to [know] when you are there." Seemingly moving toward a conclusion, the court stated: "Because of that, if you've established more than one place of residence or temporary domicile meeting that three day or more requirement, you have to identify when you move from one or the other."

¶ 25    At that point, defense counsel interceded on defendant's behalf, and another debate on charge, elements, and proof ensued—but one, at least, that brings the issues in this case into clearer focus:

> "MS. POIRIER: Your Honor, he did. He's not charged with that, that is why I did my bill of particulars. He's not charged with not informing Forest Park[;] what I'm saying is that he has—he put on the paperwork both addresses. There is no evidence that he's been trying to [game] the system. He put both addresses there.

THE COURT: But when he came back—I guess the question is—does the intent of the statute mean that when he comes back into Belvidere he has an obligation to let the folks—indirectly let the folks that live in the area—of 1123 South State Street know that he's back.

MR. WATSON: Yes, Judge, but the State's argument is that when he registered in the hospital, he treated that as his current—as his residence at that time. He was given a year date so that becomes his residence. Then you cannot consider any prior registration. So when he is released and he comes back to 1123 and-a-half, which is technically a different address, once he's been there for three days it becomes then establishing a residence here. He has three days to notify in person that address and he didn't do that.

MS. POIRIER: Your Honor, the State is saying now that they are trying to prove that my client established a new address here. This comes back to with what I said, I filed my demand for a bill of particulars. The State is now saying that he established a new address as opposed to a change of address. So we're also getting into the province of the jury. Whether or not he changed his address is for them to decide.

THE COURT: Here is what my ruling is, is that when Mr. Pearse left the hospital or at least left the last place he would have registered in which is the hospital, he had three days to do two things. One is head back to Forest Park, let those folks know that he was moving to Belvidere at 1123 and-a-half or 1123 South State Street. He also had an obligation within that three day period to show up in Belvidere and also let the folks know that he's back.

* * *

The statute is intended to put everybody on notice.

MS. POIRIER: How did he not put them on notice, Your Honor? He told them.

THE COURT: Well, except that they can't just—there is no testimony to indicate that—actually I'm sorry. The testimony was that the state police put the current residence on the state website.

MS. POIRIER: My client is not required to say anything to the state police, Your Honor. The only evidence is that my client filled out a form and he wasn't the one that filled it out, it was the officer. The officer filled out the form. My client gave them the information.

The officer chose which line to put it on. He's the one that wrote it on there. It has nothing to do with the state police. He's not charged with notifying the state police. He's charged with failing to notify a change to the chief of police in Belvidere.

That is up to the jury to decide whether or not he failed to comply with those requirements but we've gone off a bit from the trails that have nothing to do with what the evidence was presented and what the trier of fact is required to decide, Your Honor.

THE COURT: Again here is my ruling[,] is first of all he's not charged with failure to let Forest Park know within three days that he was no longer going to be living at 8311 West Roosevelt. Based upon the evidence we have here today the State would have had a much easier chance of—a much easier ability to prove that up

- 11 -

because I think that is a little more clear[-]cut with the statute that he clearly owed a duty[,] when he left the hospital within three days, go back to Forest Park and let them know where he's going to be living.

But he's not charged with that. He's charged with failure to notify the Belvidere police that he has moved here. And there are conflicting provisions under subparagraph [(b)] of 730 ILCS 150/3. On the one hand it does determine—it says establishing a residence[,] which would lead one to believe that that would be the first time that one actually identifies that location as a residence; however, that is inconsistent with the earlier phrase in that sentence, regardless of any prior registration.

Those two things, at least the way I read them, are inconsistent so instead I have to look at the intent of the statute. The intent of the statute is to put everybody on notice, not just the Forest Park folks, that hey I'm leaving your jurisdiction, you can take me off your records, but also the place that you are coming back to[,] to notify the folks that live in the area, hey, I'm back, I just want to let you guys know.

Ms. Poirier, you have excellent arguments[,] and there is a good chance that two if not three Appellate Court judges will agree with you on yours, which means that—"

¶ 26    Defense counsel then interrupted to remind the court of the rule of lenity, noting that the court had agreed that "two different people of reasonable intelligence can disagree as to what this means" and thus the statutes should be interpreted in a way that favors the defendant. The court responded that the statute at least put defendant on notice that he needed to register, adding: "I think he might have." The court went on to suggest, had defendant "come forward with an affirmative defense" that he complied with the statutes as he understood them—"I just assumed that Forest Park would let Belvidere know that I was back"—that defendant's argument for lenity might have some merit; however, the court commented, "that didn't happen." Again, attempting to conclude:

"THE COURT: He didn't register anywhere within three days so I'm going to find that the meaning of subparagraph of 150/3—

MS. POIRIER: So is that what he's charged with now?

THE COURT: What he's charged with—which was changed—which is exactly what he has here is that he knowingly[7] failed to register a change of address pursuant to subsection 3, which means the original statute cited by the State would be accurate.

Subsection [3(b)] requires one to register in person any time that there is—within three days of establishing a residence—I'm interpreting establishing to include also reestablishing a prior residence that one had registered under because of the phrase 'regardless of any prior registration' understand—this references you back to subsection [3(a)]. [3(a)] is your normal registration requirements[,] which require him to come into the Belvidere police and fill out new paperwork indicating that he's back at 1123 South State Street. So that is my ruling."

[7]Despite the reference to defendant having acted "knowingly," the parties and the court were in agreement that the charge entailed a strict liability offense, and the indictment was in fact amended to delete the "knowingly."

- 12 -

¶ 27    Having fully explored the parameters of ambiguity—in the statute and the charge—and having chosen one of what the court appears to have conceded are multiple reasonable interpretations, the court returned to the matter at hand, the matter that prompted the foregoing colloquies of confusion—the instructions that the jury would consider in determining whether defendant was guilty or innocent of the felony charge. The trial court ultimately decided to give People's Instruction No. 11, which was Illinois Pattern Jury Instruction, Criminal, No. 9.43F (4th ed. Supp. 2011) as modified, over defendant's objection. It read: "A person commits the offense of failure to register as a sex offender when he fails to report a change of address." With respect to an elements instruction, the court settled on People's Instruction No. 13A:

> "To sustain the charge of failure to register as a sex offender the State must prove the following propositions:
>
> *First Proposition:* That the defendant was a sex offender, and
>
> *Second Proposition:* That the defendant established a fixed residence or temporary domicile different from his last place of registration, and
>
> *Third Proposition:* That the defendant failed to report that address change within three days.
>
> If you find from your consideration of all the evidence that each of these propositions has been proven beyond a reasonable doubt, you should find the defendant guilty.
>
> If you find from your consideration of all the evidence that any of these propositions has not been proven beyond a reasonable doubt, you should find the defendant not guilty."

Instructions defining "fixed residence" and "temporary domicile" were given but are not at issue in this case.

¶ 28    The jury found defendant guilty. The court denied his posttrial motion and subsequently sentenced him to 30 months' conditional discharge. Defendant timely appealed.

¶ 29    The appellate court affirmed defendant's conviction, with one justice dissenting. 2016 IL App (2d) 140051-U. The majority, at the outset, determined that the pertinent language of section 3 is ambiguous as applied to this case. *Id.* ¶ 36. The court acknowledged the rule of lenity—which favors construing ambiguities in criminal statutes in favor of the accused—but noted that rule is subordinate to the primary goal of effectuating the legislature's intent. *Id.* ¶ 35 (citing *People v. Garcia*, 241 Ill. 2d 416, 426-27 (2011)). The court observed that the purpose of the Act is to enhance public safety by enabling law enforcement agencies to keep track of sex offenders. *Id.* ¶ 37 (citing, *inter alia*, *People v. Malchow*, 193 Ill. 2d 413, 420 (2000)). The appellate majority acknowledged the State's argument that its construction of section 3 serves that purpose; however, the majority hastened to point out:

> "Of course, defendant's situation is distinctive, as he moved back to the address from which he had departed, and he had already registered with the police department in the jurisdiction of his address of return. *** When defendant returned from Forest Park, his current address was the one at which he had registered with the Belvidere police less than a year earlier." *Id.*

- 13 -

¶ 30    Addressing the central question posed by this appeal—whether defendant was legally required to register again with the Belvidere police upon his return from the hospital—the court focused on the same statutory language that the trial court had found dispositive. Although the appellate court acknowledged that subsection (a) of section 3 does not appear to impose such a requirement by itself, the majority believed that subsection (b) could be read to address defendant's circumstances: "As the trial judge reasoned, if defendant's return to 1123 South State in Belvidere was an act of 'establishing a residence,' then, 'regardless of any initial, prior, or other registration,' he was required to register with the Belvidere police department." *Id.* ¶ 38 (quoting 730 ILCS 150/3(b) (West 2012)).

¶ 31    The appellate court ultimately determined that "the rule of lenity must give way to the fundamental principle of effectuating the intent of the legislature in the event of a conflict between the two"—which the appellate court implicitly found—and, considering the Act's purpose, in light of the interaction of section 3 with section 6 of the Act, "reregistration" would be required. *Id.* ¶ 40. The appellate court stated it could not determine from the record whether defendant notified the Belvidere police when he moved to Forest Park in January 2012, but it assumed he did. The court noted that the law required him to do so.[8] The majority did not speak to, much less make any assumptions as to, whether defendant may have notified the Forest Park police upon his return to his previously registered Belvidere address, as section 6 and/or 3 would arguably require in this circumstance.

¶ 32    However, the majority did pose a hypothetical, based loosely on the facts of this case, with the assumption that the registrant notified a hypothetical municipality, corresponding to Forest Park, upon his departure:

> "A sex offender who is duly registered at an address in Municipality *A* moves to what becomes a residence in Municipality *B*. He reports to the police department of *A* that he has departed its jurisdiction, and he registers with the police department of *B*. He then moves back to *A*, resides at the prior address, and reports the move to the police in *B*. However, the police in *A* do not receive any word from the police in *B* that he is now within their jurisdiction." *Id.* ¶ 42.

The majority determined that the legislature, confronted with those circumstances, would have intended that the offender "register again with *A*." *Id.* ¶ 43. The court appears to have based that determination in principal part upon "the danger" posed by its hypothetical, *i.e.* that apart from any actual notification, or lack thereof, on the part of the registrant, "the police in *A* do not receive any word from the police in *B* that he is now within their jurisdiction." The salient "danger" in this instance was that "the [Belvidere] department was not on notice that, sometime later, defendant had returned from Forest Park and was now residing in Belvidere." The court believed that the evidence at trial, "particularly Pollock's

_____

[8]The appellate court was apparently referring to either (1) the provision of section 3, which requires a registrant who is "temporarily absent from his or her current address of registration for 3 or more days" to "notify the law enforcement agency having jurisdiction of his or her current registration" of his "itinerary for travel, in the manner provided in Section 6 of this Act for notification to the law enforcement agency having jurisdiction of change of address[,]" or (2) section 6 itself, which requires a person changing his or her address to notify the law enforcement agency with whom he or she last registered of a new address. In either case, we note that the trial judge concluded, "[defendant is] not charged with failure to let Forest Park know."

- 14 -

testimony, showed that this danger was not merely hypothetical but actually manifested itself here." *Id.* ¶¶ 42-43. The appellate court quickly acknowledged:

> "We are compelled to note that in this case the Belvidere police apparently did not have great difficulty locating defendant once he had resided in Belvidere long enough to trigger the operation of section 3 (as we have construed it). Nonetheless, the value of construing the Act as we have appears to us to outweigh any arguments regarding the issues of lenity or inconvenience." *Id.* ¶ 44.

¶ 33 Given its construction of the Act and its consequent determination that defendant was proved guilty of the charged offense beyond a reasonable doubt, the court found that defendant's claim of instructional error was meritless as well, as it was based on defendant's contention that the instructions incorrectly assumed that he "established" a residence when he returned from Forest Park. *Id.* ¶ 45.

¶ 34 The dissenting justice was of the opinion that defendant did what he was required to do under the law and that he was *not* required to reregister his home address—already registered within the same calendar year—upon his release from the hospital. She first noted that it was Officer Keeling, not defendant, who decided what categories would be checked on the registration form and what information went where. *Id.* ¶ 53 (Hutchinson, J., dissenting). Further, she observed that the form should have served as a valid registration of *two* addresses: that of the Forest Park hospital, as well as defendant's home address in Belvidere. *Id.* ¶ 54. She cited appellate authority holding that an offender may have multiple registered addresses during the annual registration period. *Id.* ¶¶ 55-56 (citing *People v. Robinson*, 2013 IL App (2d) 120087, ¶ 18, and *People v. Peterson*, 404 Ill. App. 3d 145, 152 (2010)).

¶ 35 The dissenting justice next challenged what she deemed the contrived terminology of the form supplied by the ISP:

> "So what about the distinction between 'Resident Address' and 'Secondary Address'? There isn't one, at least *not* in the Registration Act. In fact, the terms 'Resident Address,' 'Secondary Address,' and 'last registered address' do *not* appear in the Registration Act *at all.* They are thus unknown to our state's laws. The terms 'Resident Address' and 'Secondary Address' appear to have been crafted by the drafters of the registration form, the Illinois State Police's Sex Offender Registration Unit, but a state agency cannot broaden its authority beyond the confines of a statute. See, *e.g.*, *People v. Woodall*, 333 Ill. App. 3d 1146, 1149 (2002). Likewise, the phrase 'last registered address' appears to have been created out of whole cloth by the prosecution in this case, seemingly as a means of explaining away the January 5, 2012, registration form." (Emphases added and in original.) *Id.* ¶ 57.

The dissenting justice took the view that the registration form's "extra-legislative distinctions" between an offender's "resident" address and "secondary" address should not be considered, resulting in a January 5, 2012, registration form that registered *both* defendant's Belvidere residence and River Edge Hospital, which is entirely consistent with the Registration Act. The dissenting justice concluded that the reporting omissions inherent in the system set up by the ISP do not, given these circumstances, equate to a failure to report on the part of defendant, resulting in criminal responsibility: "That police computers spit out only a single address in response to an address query (as Sergeant Pollock testified) is

lamentable, but that technological shortcoming simply does not equate to a finding of defendant's criminal liability." *Id.* ¶ 59.

¶ 36    The dissenting justice also expressed "grave concerns regarding the notion that a hospital is a 'residence,' or that a brief stay at an inpatient medical facility constitutes a 'change in residence' under the Registration Act." *Id.* ¶ 61. She considered such a notion "absurd": "A hospital is a place someone goes to in a time of need; it is not a residence. No one admitted to a hospital for at least 72 hours would, upon reaching hour 72, turn to the staff and say, 'I live here now. This is my domicile.' Nor is it reasonable to think that upon a brief hospital stay, a person has 'abandoned' his or her residence." *Id.*

¶ 37                                                ANALYSIS

¶ 38    At the outset, we reiterate our concern that, even after the trial evidence had been presented in this case, the parties and the court were still arguing over what statutory section applied, the parameters of the charge, what had to be proven, and what *had* been proven. A defendant in a criminal prosecution has a fundamental due process right to notice of the charges against him. *People v. Clark*, 2016 IL 118845, ¶ 30. The first three of those concerns, at least, should have been resolved before trial. It appears that the defense sought, unsuccessfully, to do so.

¶ 39    Granted, in fairness to all concerned and as generally acknowledged by the parties, the circuit court, and the appellate court, the relevant statutory scheme leaves something to be desired, in terms of clarity and consistency, when applied to these facts. In that respect, it bears repeating that a statute with which a defendant is charged should (1) be sufficiently definite, when measured by common understanding and practices, to give a person of ordinary intelligence fair warning as to what conduct is prohibited or required and (2) provide sufficiently definite standards for law enforcement and triers of fact such that its application, in a given circumstance, does not depend merely on their private conceptions. See *People v. Molnar*, 222 Ill. 2d 495, 524-25 (2006). With respect to the facts of this case, there is certainly ambiguity, as the appellate majority found. 2016 IL App (2d) 140051-U, ¶ 36. "When construing criminal statutes, the rule of lenity requires that any ambiguity must be resolved in that manner which favors the accused." *People v. Williams*, 2016 IL 118375, ¶ 15. That rule, however, must not be stretched so far as to defeat the legislature's intent. *Id.* The appellate majority, perceiving a conflict between application of the rule and its concept of legislative intent, determined that the rule of lenity, in this instance, "must give way to the fundamental principle of effectuating the intent of the legislature in the event of a conflict between the two." 2016 IL App (2d) 140051-U, ¶ 40.

¶ 40    We find no inherent or irresolvable conflict. We disagree with the construction given the statute by the appellate majority and with its implicit determination that only its construction of the statutory scheme adequately furthers the intent of the legislature. Contrary to the appellate court's conclusion, neither the Act's purpose nor its language "compels requiring *reregistration* in this case" (emphasis added) (see *id.*); nor does the statute give adequate notice that such is required.

¶ 41    Certainly, the cardinal principle of statutory construction, to which all other canons and rules are subordinate, is that a court must ascertain and give effect to the intent of the

legislature. *People v. Johnson*, 2017 IL 120310, ¶ 30; *People v. Jackson*, 2011 IL 110615, ¶ 21. As this court has often observed, the purpose of the Act is to aid law enforcement by facilitating ready access to information about sex offenders and, therefore, to protect the public. *People v. Johnson*, 225 Ill. 2d 573, 585 (2007); see also *People v. Cornelius*, 213 Ill. 2d 178, 205 (2004) ("the primary purpose of the Registration Act *** is to assist law enforcement and to protect the public"). As applied to these facts, we construe the statutory scheme as follows—a construction, we believe, that fully promotes the purpose of the Registration Act and is in accord with the legislature's intent.

¶ 42    First and foremost, for purposes of the requirement of registration, the Act adopts a very broad definition of "fixed residence" and "place of residence or temporary domicile," defining those terms, respectively, as "any and all places that a sex offender resides for an aggregate period of time of 5 or more days in a calendar year" and "any and all places where the sex offender resides for an aggregate period of time of 3 or more days during any calendar year" (730 ILCS 150/2(I), 3(a) (West 2012)). While we appreciate the dissenting justice's reluctance to accept—as a matter of common understanding—a *short* stay in a hospital as the establishment of a "residence" at that facility (see Black's Law Dictionary 1424 (9th ed. 2009) (defining a "resident patient" as one "[d]welling in a place other than one's home on a *long-term* basis" (emphasis added))), the statutes' temporal distinctions—"5 or more days," "3 or more days"—and the purpose of the Act—to provide law enforcement with information as to the whereabouts of a sex offender—militate in favor of such a finding. Thus, defendant was required to report his presence at the hospital as a place of residence or temporary domicile. He did that, providing information for and signing a registration form filled out by a Forest Park police officer. Thereafter, depending how one interprets the term "temporary domicile," defendant either had a reported temporary domicile at the Forest Park hospital, in addition to his place of residence in Belvidere, or he had two registered, fixed residential addresses: 1123 South State Street in Belvidere (his home) and 8311 W. Roosevelt Road, Forest Park (the hospital). In either case, he indisputably reported the Forest Park address, as required by statute, and he clearly never intended to abandon his home address in Belvidere, as it was listed on the January 5, 2012, registration form, along with the address of the Forest Park hospital, as an address where he might be found.

¶ 43    The provision of section 3 that would appear relevant to defendant's circumstance, *i.e.*, an offender who is not actually changing his residence but rather seeking indefinite-term treatment in a medical facility, is that paragraph pertaining to an offender "who is temporarily absent from his or her current address of registration for 3 or more days." That paragraph provides that the offender "shall notify the law enforcement agency having jurisdiction of his or her current registration"—which in this case would have been Belvidere—of his absence, "including the itinerary for travel, in the manner provided in Section 6 of this Act for notification to the law enforcement agency having jurisdiction of change of address." 730 ILCS 150/3(a) (West 2012). The pertinent provision of section 6 states: "If any other person[9] required to register under this Article changes his or her

---

[9]Other than one who "lacks a fixed residence or temporary domicile," as referenced in the preceding sentence of the statute.

residence address \*\*\* he or she shall report in person, to the law enforcement agency with whom he or she last registered, his or her new address \*\*\*." 730 ILCS 150/6 (West 2012).[10]

¶ 44 There is no evidence in the record, one way or the other, to establish whether defendant *officially* reported his departure from the Belvidere hospital—where he apparently stayed for less than three days—to the Belvidere police; however, we note that Officer Polnow was present at that hospital before defendant was transferred to Forest Park, and defendant was not charged with a failure to report his departure from Belvidere in any event. As noted, defendant then reported the *addition of* a "temporary domicile" or new statutory "residence" in Forest Park, as is apparently required by sections 3 and 6. The form he reviewed and signed on January 5, 2012, properly listed *both* of his addresses. The next step of notification apparently required by the statutory scheme would have been precipitated by defendant's departure from the hospital in Forest Park to return to his previously, *and currently*, registered home address in Belvidere. Defendant's obligation under the statute, as we construe it, was then to notify "the law enforcement agency with whom he \*\*\* last registered," *i.e.*, Forest Park, of "his \*\*\* new address." See 730 ILCS 150/6 (West 2012).[11] Again, the record does not inform us one way or the other whether defendant did that; however, despite the confusion over the charge or charges defendant faced, the trial court stated, definitively, without contradiction by the State, that "he's not charged with failure to let Forest Park know within three days that he was no longer going to be living at 8311 West Roosevelt. \*\*\* [H]e's not charged with that.[12] He's charged with failure to notify the Belvidere police that he has moved here."

---

[10]At the end of the lengthy paragraph wherein this provision appears, there is a sentence stating: "The law enforcement agency shall, within 3 days of the reporting in person by the person required to register under this Article, notify the Department of State Police of the new place of residence \*\*\*." 730 ILCS 150/6 (West 2012). The reference to "this Article" suggests that this sentence, addressing which law enforcement agency is responsible for reporting an offender's whereabouts to the central database maintained by the ISP, applies to all preceding scenarios, including an offender "temporarily absent" from his or her home or who was present in a "temporary domicile" and is returning to his or her registered home address.

[11]Although the parties do not cite or discuss section 5-5 of the Act, the language employed in that section would seemingly render it at least arguably applicable here. That section mandates that a hospital releasing or discharging a sex offender must, *inter alia*, (1) require the offender to "read and sign such form as may be required by the Department of State Police," (2) "obtain information about where the person expects to reside," and (3) "report the information to the Department of State Police within 3 days." Section 5-5 then states that the ISP "shall notify the law enforcement agencies having jurisdiction where the person expects to reside." 730 ILCS 150/5-5 (West 2012). Assuming that a hospital complies with its statutory duty, the discharge of a sex offender confined there will be accompanied by contemporaneous notice to the State Police of the offender's residential destination and, shortly thereafter, notice to the law enforcement agency having jurisdiction where the person expects to reside. With respect to the circumstances to which it is intended to apply, this section would seem to give adequate notice to the law enforcement agency having jurisdiction over a sex offender's fixed residence and provide such information of an offender's current whereabouts as to protect the citizens of that vicinity.

[12]The keeper of the sex offender files for Forest Park—the counterpart of Sergeant Pollock—did not testify to what was or was not in his file.

¶ 45    In order for defendant to be guilty of a failure to notify Belvidere authorities of his return, there would have to be a statutory duty to "reregister" defendant's home address, which was already registered in April 2011 and reported once again when defendant registered the Forest Park hospital address on January 5, 2012. We find no statutory basis for such a duty. The terms "reregister" or "reestablish" do not appear anywhere in the statutory scheme. The phrase in subsection (b) of section 3 that the circuit court found problematic and upon which the appellate majority sustained defendant's conviction for a section 3 violation—stating that a sex offender must, "regardless of any initial, prior, or other registration," register "within 3 days of *** establishing a residence" (730 ILCS 150/3(b) (West 2012))—to us means nothing more than that a defendant must register *additional* locations where he or she "resides" for three or more days, notwithstanding registration of earlier locations. As the appellate court has held, a sex offender may, consistent with the plain language and purpose of the Act, be required to register more than one location that qualifies as a "residence" or "temporary domicile." See *People v. Robinson*, 2013 IL App (2d) 120087, ¶ 18. The Act's broad, highly inclusive locational definitions dictate that result, providing the authorities with every location where an offender might be found.

¶ 46    It seems to us, however, that the statutory mechanism for more precisely tracking the present whereabouts of an offender is that contained in the following provisions of section 3 and section 6 of the Act. The applicable provision of section 3 requires an offender "temporarily absent from his *** current address of registration for 3 or more days" to "notify the law enforcement agency having jurisdiction of his *** current registration" of, *inter alia*, his "itinerary for travel, in the manner provided in Section 6 of this Act for notification to the law enforcement agency having jurisdiction of change of address." 730 ILCS 150/3(a) (West 2012). Section 6, the explanatory section referenced in section 3, like section 3, requires someone changing his or her address to notify the "law enforcement agency with whom he or she last registered" of "his or her new address." 730 ILCS 150/6 (West 2012). In both instances, an offender, upon leaving a current registered address, must notify the law enforcement agency having jurisdiction of that location that he is departing, either temporarily or perhaps permanently, specifying where he is going. Thus, we believe it is the intent of the legislature that the offender be tracked by giving notice to the law enforcement authorities in the jurisdiction he is leaving. Defendant was not charged with failure to give *that* notice, and there was no evidence in any event that he failed to do so.

¶ 47    We conclude that the evidence presented by the State failed to establish a violation of section 3 of the Act, the section specified in the indictment. Given this finding, there is no need to address the instructional issue raised in this appeal.

¶ 48    In light of the confusion exhibited by the parties, the circuit court, and the appellate panel in this case, we believe it appropriate to encourage the legislature to review this statutory scheme and revise it for purposes of clarity if our construction is not what it intended. There is no doubt that the Act performs a vital function in assisting law enforcement agencies in keeping their communities safe. However, persons subject to the Act's provisions must also have fair notice of what is required. It appears to us that defendant attempted to comply. Even after all the evidence had been presented in this case, the parties and the trial court struggled to figure out what compliance entailed. It should not be thus.

¶ 49    Moreover, we note, as did the dissenting justice in this case, that certain terms used in the registration forms, such as " 'Resident Address,' 'Secondary Address,' and 'last registered address' do *not* appear in the Registration Act *at all.*" (Emphases added and in original.) 2016 IL App (2d) 140051-U, ¶ 57 (Hutchinson, J., dissenting). Their utility in establishing a sex offender's whereabouts and in supporting a prosecution for statutory violations appears questionable at best. Sergeant Pollock could not even give an adequate explanation of the use of the "secondary address" designation on the form. Finally, we tend to agree with the dissenting justice that the "technological shortcoming" of the computer system set up by the ISP, which "spit[s] out only a single address in response to an address query," should not, where it does not reflect statutory requirements and realities, "equate to a finding of [a] defendant's criminal liability." *Id.* ¶ 59.

¶ 50                                    CONCLUSION

¶ 51    For the foregoing reasons, we reverse the judgment of the appellate court.

¶ 52    Reversed.